

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| DELTA STAR, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> NSTAR ELECTRIC & GAS CORP., <br><br> *Defendant.* | CIVIL ACTION NO. 6:05-CV-00022 <br><br><br> MEMORANDUM OPINION <br><br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on Plaintiff Delta Star, Inc.'s motion to dismiss Counts Two and Three of the Counterclaim of Defendant NSTAR Electric and Gas Corp. ("NSTAR"). For the reasons stated below, the motion will be denied in an order to follow.

## I. BACKGROUND

### *A. Allegations*

Delta Star is a Delaware corporation with its principal places of business in Lynchburg, Virginia, and San Carlos, California. Delta Star designs, engineers, manufactures and sells mobile electric substations. NSTAR is a Massachusetts corporation with its principal place of business in Massachusetts which provides services to electricity transmission and distribution affiliates that serve retail customers in eastern Massachusetts.

On or about October 26, 2001, Delta Star and NSTAR entered into a purchase agreement whereby Delta Star agreed to manufacture and sell a mobile transformer unit (the "transformer")

1

to NSTAR for $798,117.00 (the "Agreement.").[1] The Agreement's "Mobile Transformer Warranty" (the "Warranty") provides that the transformer, "together with all parts included in the original purchase, is free of defects in workmanship and materials."[2] *Mot. to Dismiss*, Exh. A. The Warranty covers "any defects and malfunction of the transformer *except* that which may occur because of . . . improper installation, handling, operation or for any cause other than defects in workmanship and materials. " The "method and extent" of any repairs to be under the warranty *"rests solely with Delta Star." Id.* (emphasis added).[3] The Warranty also contains language limiting NSTAR's rights and remedies under the contract:

> The seller, Delta Star, Inc., shall not be liable for special, indirect, or consequential damages, and this warranty is in lieu of all warranties of merchantability, fitness for a particular purpose or other warranties expressed or implied, and the remedies of the customer herein provided fulfill all liabilities of Delta Star, whether in warranty, contract, negligence, or otherwise.

*Id.*

Delta Star shipped the transformer to NSTAR with a usage manual instructing NSTAR to conduct a "turns ratio test" to verify all control settings before energizing it. The instructions stated that failure to do so could result in equipment malfunction, damage, and personal injury. A "Transformer Test Report" ("TTR") dated September 9, 2003, which contained a "Final Ratio" analysis, was also sent with the transformer.

NSTAR energized the transformer on or about July 8, 2003. Delta Star maintains that

---

[1] The Agreement provides that it is to be governed by the laws of Massachusetts.

[2] Parts manufactured by Delta Star are covered under the Warranty for 60 months, while "all other component parts" are covered for 12 months.

[3] Transportation costs "resulting from defects in workmanship and materials" are to be borne by Delta Star.

2

NSTAR did so without taking the necessary precautionary steps outlined in the usage manual, including but not limited to verification of the control settings through a turns ratio test. NSTAR, however, avers that its personnel did perform the turns ratio test prior to energization, but that the results of this test were at odds with both the "nameplate" designations on the transformer and the results of the TTR, which indicated that the transformer was properly wired. To account for these anomalous results, NSTAR personnel performed certain calculations and ultimately concluded that the nameplate designations and TTR results should be given greater credence than the turns ratio test, and, accordingly, proceeded with energization.

Upon energization, the transformer failed to perform and incurred damage that rendered it inoperative (the "Incident"). Delta Star sent representatives to Massachusetts in response to the Incident. The parties agreed that one of the failed components was the lightning arrester ("Arrester"). They were unable to agree, however, on the ultimate cause of the Incident. Citing the Warranty, NSTAR demanded full repairs. Also citing the Warranty, Delta Star agreed only to replace the Arrester, claiming that it had no further obligations because NSTAR's mishandling had caused most of the damage. Delta Star requested reports and data concerning NSTAR's testing and operation of the transformer, which information NSTAR did not provide for fourteen months. NSTAR alleges that it refused to provide the requested information "because of concerns about Delta's intended use of such information."

For a period after the Incident, the parties discussed retaining an independent expert to determine its cause. While NSTAR wanted the expert to conduct only a technical assessment of the cause, Delta insisted that the expert also make a final, binding determination of the respective degree of fault of Delta and NSTAR. NSTAR eventually refused the latter terms.

3

Despite disagreeing as to the cause of the Incident and their respective roles in it, the parties agreed to have the transformer shipped to Delta Star's facility in Lynchburg, Virginia. NSTAR alleges that Delta did not take any action to repair the transformer (including the Arrester), and refused to do so unless NSTAR first agreed to accept responsibility for the damage and costs of repair other than replacement of the Arrester. Delta Star denies these allegations.

NSTAR eventually retrieved the transformer from Delta Star and sent it to a Connecticut company, Electric Services, Inc. ("ESI"), for repairs totaling $89,660.00. NSTAR avers that ESI discovered that the transformer contained a fatal manufacturing defect, in that the "high" voltage connection was wired to the "low" voltage outlet, and vice-versa (the "Defect"), which caused the transformer to fail explosively during energization. Given the nature of the Defect—which involved internal cross-miswiring —NSTAR alleges that it must have existed when the transformer was originally shipped from Delta Star's factory, and that the Final Ratio report should have revealed the Defect and prevented Delta Star from shipping the transformer.

### *B. Procedural Background*

Delta Star brought this diversity action on December 9, 2005, seeking a declaratory judgment that NSTAR's failure to follow appropriate instructions before energizing the transformer caused its failure; that Delta Star has no obligation under the Warranty to repair the transformer; and that NSTAR voided any application of the Warranty by taking possession of the transformer and assuming control over repairs to it.

NSTAR filed a three-count counterclaim. Count One alleges that Delta Star breached the Agreement by failing to repair defects in the transformer's workmanship and materials under the Warranty. Count Two alleges that Delta Star violated Massachusetts General Laws, Chapter

4

93A, Section 11 ("Section 11"), which prohibits unfair and deceptive practices as between commercial parties, by either falsifying results for a TTR that was never performed, or deliberately or negligently misrepresenting the actual TTR results.[4] Finally, Count Three alleges that Delta Star breached the covenant of good faith and fair dealing implied in the Agreement by (1) delivering the negligently or deliberately false TTR; (2) insisting that NSTAR accept responsibility for substantially all repair costs as a condition of having the transformer evaluated by a technical expert and repaired; and (3) refusing to repair the Arrester, which Delta acknowledged was covered under the warranty, unless and until NSTAR accepted responsibility for all other damage to the transformer.

NSTAR seeks approximately $150,000 in compensatory damages, prejudgment interest, costs, and "punitive damages to the full extent of the law, including as pursuant to . . . Section 11 which provides for award [sic] of up to treble damages."

Delta Star filed a motion to dismiss Counts Two and Three of the counterclaim, arguing *inter alia* that consequential damages are excluded under the Warranty. In its response, NSTAR clarified that it was seeking only "actual monetary and property losses," and at the July 19, 2006 motion hearing, it further denied that it was seeking any consequential or incidental damages. NSTAR has thus waived any right to seek consequential or incidental damages.

---

[4] NSTAR also argues in its response in opposition to the motion to dismiss that Delta Star's conduct conditioning its repair of the transformer on NSTAR's acceptance of legal responsibility for the damage and cost of repair, while knowing that NSTAR urgently needed a functioning transformer for its business, also constituted an unfair act or practice. *Response in Oppos.* at 7. NSTAR did not make this allegation in connection with Count Two of its Answer and Counterclaim, nor has it requested leave to amend. Thus, the Court will not consider it in its discussion of Count Two below.

## II. STANDARD OF ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint and does not resolve contests concerning the facts. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994). A court must accept as true all well-pleaded allegations and must construe the factual allegations in the light most favorable to the plaintiff. *Id.* A complaint is sufficient if it sets out sufficient facts for the court to infer that each element of a cause of action is present. *See Wolman v. Tose,* 467 F.2d 29, 33 n.5 (4th Cir. 1972). "A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325, 328 (4th Cir. 1996) (*en banc*).

This standard of review is subject to Fed. R. Civ. P. 9(b), which provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Failure to comply with Fed. R. Civ. P. 9(b)'s heightened pleading requirements is treated as failure to state a claim under Rule 12(b)(6). *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 n. 5 (4th Cir. 1999).

## III. DISCUSSION

### A. Count Two - Unfair or Deceptive Act or Practice Under Mass. Gen. Laws ch. 93A, § 11

Chapter 93A, section 11 ("Section 11") of the Massachusetts General Laws provides:

> Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of . . . an unfair or deceptive act or practice . . . may . . . bring an action . . . for damages and such equitable relief . . . as the court deems to be necessary and proper.

6

Delta Star argues that NSTAR's unfair commercial practices claim under Section 11 must be dismissed because NSTAR waived its right to assert this cause of action under the Warranty; NSTAR has pled insufficient facts to state a claim for deceit; and its allegations only amount to a breach of contract claim, and do not as a matter of law rise to the level of rascality required to state an unfair commercial practices claim.[5]

### *1. Do the Warranty's Provisions Limiting NSTAR's Remedies Bar Its Claim Under Section 11?*

The Warranty excludes Delta Star's liability "for special, indirect, or consequential damages" and states that the remedies provided for in the Warranty "fulfill all liabilities of Delta Star, whether in warranty, contract, negligence, or otherwise." Citing *Canal Electric Company v. Westinghouse Electric Corporation*,[6] Delta Star claims that Count Two, a statutory claim that permits recovery of actual damages, attorneys fees, costs, and offers the potential of double or treble damages, must be dismissed pursuant to these "Limitation of Liability" provisions.

*Canal Electric* involved a contract for the delivery and installation of a set of rotating blades in a steam turbine generator. *Canal Elec.*, 548 N.E.2d at 183-84. After cracks were discovered in the blades that put the generator out of service for months, Canal brought an action alleging breach of warranty, negligence, and a violation of Mass. Gen. Laws ch. 93A, § 11. *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 756 F. Supp. 620, 622–24 (D. Mass. 1990). On summary judgment, Westinghouse argued *inter alia* that Canal had waived its right to bring the

---

[5] As NSTAR has waived its right to seek consequential damages, the Court will not take up Delta Star's argument that such economic losses are not recoverable under the Warranty or under Mass. Gen. Laws ch. 93A, §11 (2006).

[6] 548 N.E.2d 182 (Mass. 1990).

7

Section 11 claim, having agreed to a Limitation of Liability provision in one of Westinghouse's selling policies.[7] *Id.* at 622.

As the question of whether a commercial party could contractually waive its rights under Section 11 was an issue of first impression, the federal court hearing the case certified it to the Supreme Judicial Court of Massachusetts (the "Court"). Noting the general rule that "a contractual waiver of statutory rights is permissible when the statute's purpose is the 'protection of property rights of individual parties . . . rather than . . . the protection of the general public,'" the Court held Canal's waiver to be effective "on the limited facts" before it. *Id.* at 187 (citing *Continental Corp. v. Gowdy*, 186 N.E. 244 (Mass. 1933)). Those facts included the Court's view of the dispute as "a purely commercial one that does not affect the public interest" and its finding that Canal's Section 11 claim was "merely duplicative" of its breach of warranty claim. *Id.* at 187-88.

*Canal Electric* is readily distinguishable in that NSTAR's misrepresentation claim is a independent tort involving allegations factually distinct from those contained in its contract claim. Count One alleges breach of contract and warranty arising from Delta Star's failure to repair defects in the transformer's workmanship and materials; Count Two alleges that the Transformer Test Report that accompanied it, which showed normal results, must have contained negligent or intentional misrepresentations, given the subsequent discovery of internal mis-

---

[7] Westinghouse had two standard selling policies potentially applicable to its contract with Canal; the court did not decide which applied because they had substantively identical language limiting Canal's remedies under the contract. They both warranted that Westinghouse was liable to repair or replace any defective products discovered within a one-year period; such remedies, however, were "exclusive and . . . neither Westinghouse nor its suppliers w[ould] under any circumstances be liable under any [other] theory of recovery, whether based on contract; on negligence of any kind, strict liability or tort . . . or otherwise . . . ." *Id.* at 187 n.8.

8

wiring which would have precluded normal results. Thus, unlike in *Canal Electric*, NSTAR's Section 11 claim is not "merely duplicative" of its contract claim.

This distinction is critical under Massachusetts law. After carefully examining the scope of the *Canal Electric* holding, the Appeals Court of Massachusetts held that while limitation of liability provisions may preclude Section 11 claims founded on contract theory, such provisions are "not effective to preclude a claim under G.L. c. 93A, § 11, arising out of intentional misrepresentation, a tort-based theory or recovery." *Standard Register Co. v. Bolton-Emerson, Inc.*, 649 N.E.2d 791, 794 (Mass. App. Ct. 1995); *see also VMark Software, Inc. v. EMC Corp.*, 642 N.E.2d 587, 594 n.11 (Mass. App. Ct. 1994) (holding that a party "may not escape liability for misrepresentation by resort to" damage limitation and integration clauses, in case involving pre- and post-contract misrepresentations and failures to disclose). These precedents dispose of Delta Star's waiver argument.

### 2. *Do NSTAR's Allegations Suffice to State Claim Under Section 11?*

Delta Star also argues that Count Two must be dismissed because NSTAR has not stated all of the elements of the misrepresentation claim underlying Count Two, or, alternatively, has not alleged conduct sufficiently scurrilous to qualify as "unfair" or "deceptive" under Section 11.

A fraudulent misrepresentation claim requires proof of a false representation of material fact made with knowledge of its falsity and for the purpose of inducing the plaintiff to act thereon, and the plaintiff's reasonable, detrimental reliance upon the representation as true. *Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E.2d 1054, 1066 (Mass. 2002). Proof of either actual knowledge or a "wilful disregard of the facts as to be tantamount to fraud" satisfies the

9

knowledge element. *State St. Bank & Trust Co. v. Beale*, 227 N.E.2d 924, 925 (Mass. 1967).[8]

NSTAR has alleged that the erroneous Transformer Test Report contained false statements of material fact, and that Delta Star "knew or should have known" the TTR results were inaccurate. Contrary to Delta Star's position, NSTAR was not required to allege Delta Star's "intent to deceive" with additional particularity, or, to survive dismissal, offer a logical explanation behind its sending of false results. Although "the circumstances constituting fraud" must be "stated with particularity" under Fed. R. Civ. P. 9(b), "[m]alice, intent, knowledge, and other condition of mind . . . may be averred generally."

Delta Star also argues that NSTAR has not properly alleged detrimental reliance because NSTAR could not have relied on the TTR in agreeing to buy the transformer.

This argument is misplaced. Detrimental reliance in the context of contract formation is not at issue in Count Two. Instead, NSTAR alleges that soon after receiving the transformer—long after the parties entered into the purchase agreement—it relied on the TTR results in proceeding with energization, and that the ensuing explosion proximately resulted from the false results. *Answer & Counterclaim*, ¶¶ 6, 14, 25.[9]

---

[8] To state a negligent misrepresentation claim, a plaintiff must allege that the defendant "(1) in the course of his business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998). Because NSTAR claims that Delta Star "knew *or should have known*" (emphasis added) that the TTR results were false, the "unfair" or "deceptive" conduct alleged is tantamount to common law fraudulent or negligent misrepresentation.

[9] At this stage, Delta Star has not yet challenged the reasonableness of NSTAR's reliance.

The Court has also already rejected Delta Star's position that Count Two is just a "dressed up" contract claim and thus not cognizable under Section 11. NSTAR's allegations speak for themselves; Counts One and Two involve separate factual allegations and independent legal theories. It is irrelevant that the measure of compensatory damages resulting from the breach of contract and tort of misrepresentation may be the same. If judgments on separate contract and Section 11 claims would result in duplicative recovery, courts simply disallow damages on one of the counts and allow a successful litigant the attorneys fees and costs provided under Section 11. *Standard Register*, 649 N.E.2d at 794 n.5; *Vmark Software*, 642 N.E. 2d at 597,

Finally, Delta Star claims that the conduct alleged in Count Two is neither "unfair" nor "deceptive," as those terms have been interpreted by courts applying Massachusetts law.

Whether conduct qualifies as unfair or deceptive ordinarily must be determined from the circumstances of each claim. *Spence v. Boston Edison Co.*, 459 N.E.2d 80, 87 (Mass. 1983). A once widely cited standard—"The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce"[10]—has been disapproved. *Mass. Employers Ins. Exch. v. Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995) (finding that the rhetoric of "rascality" is "uninstructive").

To be actionable under Chapter 93A, conduct must fall "within at least the penumbra of some common-law, statutory, or other established concept of unfairness" or be "immoral, unethical, oppressive or unscrupulous." *PMP Assoc., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975).

---

[10] *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979).

11

Section 11 liability has often been imposed in cases involving false representations of roughly comparable unfairness or unscrupulousness as the conduct alleged in Count Two. *See, e.g., VMark Software*, 642 N.E.2d at 594 (software seller misrepresented the ability of its product to work with buyer's hardware and to meet buyer's computing needs, and continuously failed to disclose its knowledge of the software's limitations);[11] *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 837 N.E. 2d 1121 (Mass. 2005) (broker fraudulently misrepresented to clients the likelihood of his obtaining a substantial special allocation of technology company shares in initial public offering); *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir. 1996) (seller of defective wastewater treatment system intentionally failed to disclose to buyer that a critical component of the system was missing).[12]

A merely negligent misrepresentation may also qualify as an unfair or deceptive practice under Section 11. *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1032-33 (Mass. 2004) ("[A] negligent misrepresentation may be so extreme or egregious as to constitute a violation of G.L. c. 93A, § 11 . . . ."); *Nota Const. Corp. v. Keyes Associates, Inc.*, 694 N.E.2d 401 (Mass. App. Ct. 1998) (representations made by architectural firm to subcontractor with regard to construction project set forth potentially viable claims for deceit and negligent

---

[11] Although the court found this conduct sufficient to state a claim under Section 11, it refused to impose a double or treble damages penalty, finding that the seller's "inept blend of hopeful dissembling and dogged bumbling . . . does not . . . reflect the [requisite] 'culpable state of mind.'" *Id.* at 596.

[12] Again, the court found this conduct sufficiently unfair to be condemned under Section 11, but reversed the trial court's imposition of double damages, finding that the seller "had reason to believe that operator error was the cause of [the buyer's] problems," did not stand to profit by its actions, and "there was no evidence that [the seller] acted maliciously toward [the buyer] or remained silent so that it could watch [the buyer] go into distress." *Id.*

12

misrepresentation, and thus dismissal of subcontractor's claim under Section 11 was improper).

Under Massachusetts decisional authority, the misrepresentations alleged in Count Two are sufficient to state a claim under Section 11, and, thus, it will not be dismissed.

## B. Count Three - Breach of Covenant of Good Faith and Fair Dealing

Delta Star argues that NSTAR has not stated a claim for breach of the covenant of good faith and fair dealing because NSTAR has not alleged and cannot prove that it acted in bad faith with a specific intention to deprive NSTAR of the fruits of its contract.

Preliminarily, it must be remembered that it is not for the Court to speculate what NSTAR can or cannot prove at this stage. A motion to dismiss under Rule 12(b)(6) tests only the legal sufficiency of a complaint: whether NSTAR would be entitled to relief under any facts which could be proved in support of its claim.

Every contract governed by Massachusetts law is subject to an implied covenant of good faith and fair dealing which imposes on the parties the obligation to act in good faith to accomplish the purposes of their agreement. *Anthony's Pier Four, Inc. v. HBC Assoc.*, 583 N.E.2d 806, 821 (Mass. 1991); *Sparks v. Fid. Nat'l Title Ins. Co.*, 294 F.3d 259, 274 (1st Cir. 2002). The purpose of this covenant "is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance," and to ensure that neither injures the rights of the other "to reap the benefits prescribed by the terms of the contract." *UNO Rest., Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004). It addresses the manner of performance of agreed-upon terms, and may not be invoked "to create rights and duties not otherwise provided for in the existing contractual relationship." *Id.*; *see also Sparks*, 294 F.3d at 274.

13

A party may breach the implied covenant without breaching any express term of that contract; otherwise, it would be a mere redundancy. *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005). "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Id.* (finding a breach of the covenant where defendant "took unilateral, voluntary action that advanced its own self-interest and prevented or hindered plaintiffs from reaping substantial benefits of the contract").

NSTAR has alleged that Delta Star breached the covenant of good faith and fair dealing by making unreasonable demands—requiring it to accept responsibility for substantially all the costs of repair, or a fully binding determination of liability by a technical expert—as a precondition of repairing the transformer under the Warranty. As a result, the transformer was not repaired and unusable for months, and NSTAR ultimately had to retrieve it from Virginia and pay a company to service it.

These allegations are legally sufficient to state a claim for breach of the covenant. Delta Star warranted that it would fix defects in the transformer's workmanship and materials. The covenant implicitly requires that Delta Star not unreasonably withhold or attach unreasonable conditions to its performance under the Warranty. Recognition of this reasonableness requirement is necessary. Otherwise, nothing would stop Delta Star from avoiding its warranty obligations by placing unreasonable conditions or delaying its repairs until the buyer became so desperate for a working product that it arranged and paid for repairs itself, and then citing the Warranty provision vesting it with the exclusive right to determine the "method and extent" of

14

any repairs as grounds for refusing to reimburse the buyer. Assuming NSTAR's allegations to be true, Delta Star's unilateral placement of unreasonable conditions on its duty to repair threatens NSTAR's right to "reap the benefits prescribed by the terms of the contract" and to defeat the "intended and agreed expectations of the parties."

Serious factual questions have been raised about whether Delta Star in fact acted unreasonably in refusing to repair the transformer and in imposing the conditions alleged—NSTAR admits that it withheld information from Delta Star concerning installation of the transformer—but this is not the proper stage to address such fact questions.

The allegation that Delta Star negligently or deliberately delivered false TTR results along with the transformer is also sufficient to state a claim of breach of the implied covenant. Neither party has pointed to any express term of the contract that requires that the results accompany the transformer or that they be accurate. However, the TTR presumably was delivered for a reason—to provide NSTAR with useful information relevant to its acceptance and installation of the transformer. The covenant required the parties "to act in good faith" to accomplish the agreement's purposes, i.e. the sale and successful installation of a working transformer. Once Delta Star decided to act by providing information relevant to the accomplishment of this purpose, good faith required it not to lie, and to exercise reasonable care, to assure the veracity of this information.

## IV. CONCLUSION

For the foregoing reasons, Delta Star's Motion to Dismiss shall be denied in an order to follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum

15

Opinion to all counsel of record.

ENTERED: /s/ Norman K. Moon
U.S. District Judge

August 29, 2006
Date